IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

BETH COPSON, as Administratrix of
the Estate of KYLE ANDREW COPSON,
deceased,

        Plaintiff,

v.                                CIVIL ACTION NO. 1:19-00127

PATRICK M. HEPHNER, individually
as a member of the West Virginia
State Police, et al.,

        Defendants.


MEMORANDUM OPINION AND ORDER

        Pending before the court is defendants' motion for summary judgment.  See ECF No. 54.  Plaintiff filed a response in opposition to defendant's motion and defendants filed a reply.  See ECF Nos. 57 and 62.  After the pretrial conference and with the permission of the court, the parties filed supplemental briefs.  See ECF Nos. 78 and 79.  For the reasons discussed below, defendants' motion is **GRANTED**.

I.  Background

        At approximately 3:40 p.m., on February 22, 2017, Mercer County 911 received a call that a "male [was] walking around carrying approximately a 6 inch knife like a bowie knife" near the Exxon on Ambrose Lane in Princeton, West Virginia.  ECF No. 54-15 (Exhibit O to Defendants' Motion for Summary Judgment).

Randy Lurie, who was in the vicinity at the time, testified at his deposition that, upon pulling into the One Stop gas station in Princeton, he was approached by a man in a car who asked if he could use Lurie's phone.  See Deposition of Randy Lurie, February 20, 2020, at 9 (hereinafter "Lurie Depo. at ___") (Exhibit N to Defendants' Motion for Summary Judgment) (ECF No. 54-14). According to Lurie, the man "said that he saw a gentleman walking around in a jumpsuit with a knife, . . . agitated, walking back and forth"  Id.  The man "wanted to call the police and have them come over and check it out."  Id. at 9-10.  Lurie testified that either he or the other man called 911 using Lurie's phone.  See id. at 10.[1]

West Virginia State Police Troopers Patrick M. Hephner and James C. Long (collectively "the officers") responded to the 911 call.  Hephner and Long approached the man, who was later identified as Kyle Andrew Copson.  Copson continued to behave erratically, waving the knife and talking to himself, and walked away from Hephner and Long.  Copson led the officers through the gas station parking lot and into the parking lot of an adjacent Hardees.  While in the Hardees' parking lot, Copson continued to

---

[1] The Mercer County 911 Call Number Detail indicates that Jerry Conner made the call.  See ECF No. 54-15 (Exhibit O to Defendants' Motion for Summary Judgment).  In his interview with the State Police, Mr. Conner confirmed that he made the call using Lurie's phone.  See ECF No. 54-13 (Exhibit M to Defendants' Motion for Summary Judgment).

wave the knife and yell.  Despite repeated requests from the
officers to do so, Copson refused to drop the knife.  Eventually,
Copson came toward Officer Hephner with the knife.  At that
point, Trooper Hephner fired two shots and Trooper Long fired
one.  Copson died at the scene.

Although not known to Troopers Hephner and Long at the time
of the shooting, Copson had a history of mental illness, having
been diagnosed with paranoid schizophrenia, bipolar disorder,
anxiety, depression, and opioid addiction.  See ECF No. 54-1
(Plaintiff's Answers to Def. First Set of Interrogs., Reqs. for
Admis. & Reqs. for Production of Docs.).  On February 22, 2017,
and the days leading up to the shooting, there is evidence that
Copson was suffering from the effects of his mental illnesses.
See generally ECF No. 55 at 2-5 (and authorities cited therein).

In his statement given immediately after the shooting,
Trooper Long described what had transpired:

> Approximately about 15:40, twenty till 4:00 or whatever
> I was sitting at my desk and I heard a call come out of
> a guy wielding a knife or had a knife the call was . .
> . the description was the guy was in a grey sweat suit
> carrying a buey style knife over in the parking lot at
> the gas station across off of Ambrose Lane across the
> highway from this office, so I get up go out to the
> parking lot to get in my car I saw Trooper Hephner come
> out the back door, the door at the other end of the
> building I asked him if he was going over to cover that
> guy too, he said yeah I said I am going with you so we
> both got in each one of our cars I followed him over,
> we wound up pulling into the parking lot of the Quality
> Inn motel the guy was standing pretty much on the
> hillside between the parking lot and US route 460 we
> could see the knife in his hand, he just started

hollering stay away from me, things like it's going to
go bad you know stuff like that, so we ended up
following across Ambrose Lane into the parking lot of
the gas station, which is the Exxon station.

* * *

we are on foot left the cars in the parking lot of the
Quality Inn, um . . . in the parking lot the guy tried
to get into the gas station and Hephner pretty much was
kind of flanking him so to speak he was between the guy
and the building he wouldn't let him get into the
building I am just trailing them behind them watching
for Hephner, watching this guy and we wind up in the
parking lot of Hardee's restaurant and at that time you
know the guy he tried. . . he made a motion to get into
the restaurant and Hephner got into the landscaping
stuff to block him to get to the building, guy backs
out into the parking lot and he looked over toward
Cracker Barrel, he didn't make it to Cracker Barrel
Hephner pretty much stayed between him and the Cracker
Barrel parking lot and I am on the other side of him,
he ended up coming to me, came at me a couple three
different times with the knife, of course at that time
I already had my pistol out of the holster, I drew down
on him each time he came at me, told me to you know put
the knife down we will get you some help, you know each
time he pulled, like two or three times he pulled the
knife come at me, and then the last time he said
something to the effect I can't remember exactly how he
said it, but it was in the shape of form It is going to
go bad for somebody or one of us and he goes towards
Hephner, and I shot and then Hephner shot, I shot one
round and I think Hephner shot two rounds, so that was
pretty much it, just simple and he you know would not
put the knife down I mean Hephner did about 90 percent
of the talking with the guy and

* * *

and the whole time Hephner was like buddy please put it
down we will get you some help, see what we can do to
help you things like that you know I can't tell you
word for word what he said the whole time but that was
basically what he was saying.

4

See ECF 54-19 (Exhibits S and Q to Defendants' Motion for Summary Judgment).[2]

Trooper Long was deposed on June 23, 2020 and his deposition testimony did not differ materially from the statement he had previously given.  Long confirmed that, when they encountered him, Copson was holding a "big kitchen butcher knife." Deposition of James C. Long, June 23, 2020, at 7 (hereinafter "Long Depo. at ___") (Exhibit 3 to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment) (ECF No. 57-3).  Long also testified that Hephner asked Copson to put the knife down but that Copson refused to do so.  See id. at 9 ("Hephner was saying stuff and asking him to put the knife down, and asked him if he needed help, things like that.  I can't remember, specifically, what Hephner said.  The gist of what he was saying was, you know, asking him if he needed help, what was he doing? He asked him to put the knife down, come talk to us, stuff like that, so - - but he wouldn't put the knife down.").  Trooper Long testified that there were bystanders around the area although he could not recall how many.  Id. at 14-15 ("I remember seeing witnesses.  I can't tell you how many.  I mean there were people at the pumps.  There were people in the building.  But I'm not

_____

[2] Defendants provided an audio recording of this statement. See Exhibit Q.  Exhibit S is a transcript of that interview. Long submitted a declaration stating that the transcript is a true and accurate transcription of the statement he gave.  See ECF 54-19.

counting bystanders when I'm watching a guy with a knife.").  Of
the moments before the shooting, Trooper Long testified:

> A:  He would walk toward Hephner with the knife, and
>     every time he would walk to Hephner, Hephner would
>     ask him to put the knife down, and "We'll get you
>     some help, if you need help," stuff like that.
>     And he would back away.
>
>     And then he would walk toward me with the
>     knife, brandishing the knife to me.  He walked
>     toward me two or three, maybe four times, with the
>     knife, straight at me.  He didn't run at me, but
>     he just walked and had the knife in the air like
>     he was wanting to stab me, stuff like that.
>
>     And I can't remember what he said each time
>     after, you know.  But every time he would walk
>     toward me, I would always, you know, tell him, "If
>     you put the knife down, we'll get you some help.
>
>                    * * *
>
> Q:  [Y]ou said that he wanted to stab you.  What makes
>     you say he wanted to stab you?  You don't know
>     that, do you?
>
> A:  Well, he came at me with a knife, with a knife up
>     in the air, you know, the knife pointed at me.  I
>     mean, it was more than one time, sir.
>
> Q:  Okay.  You said he had it pointed - -
>
> A:  He had it up in the air with the knife pointed at
>     me.
>
> Q:  Was the knife pointed down coming at you?
>
> A:  I said pointed at me, sir.
>
> Q:  Okay.  Well, I'm asking which direction the knife
>     was pointing.  Was it pointing up in his hand, or
>     down in his hand?
>
> A:  I don't recall, you know, if it was straight up,
>     straight down, but he was coming at me pointing
>     the knife at me.

Q:   Okay.  But you don't recall him say[ing] anything
     to you?

A:   He said things to me, but I don't remember what he
     said.  But when he came at me with the knife, I
     mean, I just said, "If you put the knife down,
     we'll get you some help."  And he would back off.

Q:   Okay.

A:   Then he would make his directions toward Hephner,
     walk toward him.

Q:   Would you agree with me that once you had him in
     the Hardee's parking lot, Mr. Copson was cornered?
     He had nowhere else to retreat to.  If that a fair
     assessment of the situation?

A:   No, sir.  I don't agree with you.

Q:   Okay.  Where else could he have - - based on what
     you recall, once in the Hardee's parking lot,
     where else could he have retreated to?

A:   Sir, it was a wide open parking lot.  There was
     just two of us.  He could have took off and ran in
     any direction away from us.

Q:   Okay.  Did he ever appear to try to run away from
     you all?

A:   No, sir.

                        *  *  *

Q:   Tell me about the actual shooting itself, like,
     once Mr. Copson, I guess, stopped retreating.  We
     have some of this on video, but I just want to get
     your recollection of what happened in just the
     moments right before the shooting actually
     happened.

A:   Well, I mean, he made several attempts walking toward
     Hephner, and he would back up; several attempts toward
     me brandishing the knife on both of us each time he
     came at us.  He finally made a statement, and I don't
     recall exactly what he said, but it was something to
     the effect of, basically, like, "It's either me or you

                           7

> guys, or somebody is going to get hurt," maybe, "You
> guys get hurt," whatever he said.  Then he just takes
> off running toward Hephner.  And I shot one round, and
> Hephner shot two rounds.

> Q:   Is that, like, a verbatim quote that you remember
>      hearing Mr. Copson say, or is that just another
>      generalization

> A:   It's a generalization. . . .

Id. at 18-21.  Long estimated that Copson was five to eight yards
from Trooper Hephner when he opened fire.  See id. at 22.

In his statement following the shooting, Trooper Hephner
stated that, after encountering Copson initially, he followed him
when Copson walked away from the officers.  ECF No. 54-18
(Exhibits R and Q to Defendants' Motion for Summary Judgment).[3]
Hephner testified that he told Copson that he "couldn't leave
because he was acting a little bizarre and had a knife in public
that he was openly carrying."  Id.  Hephner stated that Copson
said "someone is going to get hurt" and that he thought "maybe he
just wanted to get inside somewhere and cut somebody."  Id.
Trooper Hephner described his interaction with Copson leading up
to the shooting as follows:

> I tried telling him, tried talking to him tried asking
> him to . . . telling him to put the knife down we could
> talk about it what is the problem he said I couldn't

---

[3] Defendants provided an audio recording of this statement.
See Exhibit Q.  Exhibit R is a transcript of that interview.
Hephner submitted a declaration stating that the transcript is a
true and accurate transcription of the statement he gave.  See
ECF 54-18.

help him told me to F. . . off, people were going to
get hurt someone is going to get hurt, get the F away
from me just completely belligerent irrational uh he
made a couple of lunges towards both Cpl. Long and I a
couple of different times um and when he came . . . or
when Cpl. Long I don't know when he had his out but I
remember watching him when the gentleman got very close
and lunged towards Cpl. Long, Cpl. Long drew down on
him um I had my weapon already at the low ready and
continued to trying to talk him down tried to calm him
down, calm him down he wouldn't listen he . . . uh when
Cpl. Long drew down on him he backed off a bit and just
completely denied everything I tried telling him to
drop the knife and to just calm down and he lunged at
me and I shot him.

Id.

There were a number of eyewitnesses to the shooting and the

events preceding it.  Mr. Lurie captured the incident on video

using his cell phone.  See ECF No. 54-16 (Exhibit P to

Defendants' Motion for Summary Judgment).  Mr. Lurie testified:

The one officer kind of flanked him around a little bit
so to keep him from walking through the parking lot to
kind of, you know, keep him from going any further.
And that's when they started talking back and forth,
and you can see on the video what happened there, but
he walked towards them a couple time with the knife
out, as they were yelling—they were, the whole time,
yelling at him to drop the knife.  And he was just
screaming something or another at them.  I don't know
what he was saying.  And then he went forward once and
then he came back, and they both had their guns drawn.
They were kind of a little bit lower at first, but then
they had them straight up at him as he was walking—as
he walked towards them the one time.  He backed up and
then turned towards the officer to his left and started
walking towards him faster with the knife out.  And
that's when the officer shot him twice.  It sounded
like twice.

Lurie Depo. at 17.  Besides Lurie, there were six other

eyewitnesses to the shooting: Charles Mutterback, Jerry Conner,

9

Jesse Ray Dodson, Phillip Newman, Roger Stephens, and Wanda Mutterback.  See ECF No. 54-13 (Exhibit M to Defendants' Motion for Summary Judgment).  These statements were generally consistent.  All the eyewitnesses confirmed that Copson was carrying a knife and waving it around.  See id.  Multiple witnesses described Copson's movement as erratic and described him "lunging" at the officers.  Id.  Most indicated that they heard the officers repeatedly ask Copson to drop the knife.  See id.  Roger Stephens did state that it "seemed like to [him] they could have avoided killing [Copson]."  Id.

The video shows the actual shooting and the seconds leading up to it.  Copson is clearly agitated and seen with a knife which he is waving around.  He moves towards the officers and then backs away more than once.  He is seen moving toward Trooper Hephner just before he is shot.  It is impossible to hear what Copson or the officers are saying.  See ECF No. 54-16

On February 21, 2019, Beth Copson, as Administratrix of the Estate of Kyle Andrew Copson, filed a four-count complaint under federal and state law in which she alleged that Troopers Hephner and Long violated Kyle Andrew Copson's constitutional rights by using excessive and deadly force against him on February 22, 2017.  Her complaint alleged the use of excessive force in violation 42 U.S.C. § 1983 (Count I); state constitutional

10

violations (Count II); battery (Count III); and negligence (Count IV).

Defendants filed a summary judgment motion arguing that they were entitled to judgment as a matter of law on all claims.  In response to defendants' motion, plaintiff agreed to dismiss her state constitutional and battery claims.  See ECF No. 57 at 7 n.4.  Furthermore, at the pretrial conference, counsel for plaintiff withdrew the negligence claim.[4]  Defendants argue that

---

[4] In any event, the negligence claim would have been dismissed.  As Judge Copenhaver recently noted:

> A plaintiff cannot prevail on a claim of simple negligence based on a defendant's intentional act.  Smith v. Lusk, 533 F. App'x 280, 284 (4th Cir. 2013); see also Brown v. J.C. Penney Corp., 521 F. App'x 922, 924 (11th Cir. 2013) (per curiam) ("A claim for negligence cannot be premised solely on a defendant's alleged commission of an intentional tort."); Stone v. Rudolph, 32 S.E.2d 742, 748 (W. Va. 1944) ("Negligence and wilfulness are mutually exclusive terms which imply radically different mental states.").  "[A] mere allegation of negligence does not turn an intentional tort into negligent conduct." Weigle v. Pifer, 139 F. Supp. 3d 760, 780 (S.D.W. Va. 2015) (quoting Benavidez v. United States, 177 F.3d 927, 931 (10th Cir. 1999)).

Schoonover v. Clay County Sheriff's Dep't, Civil Action No. 2:19-cv-00386, 2020 WL 2573243, *10 (S.D.W. Va. 2020).

The acts alleged against defendants are only for intentional conduct.  Therefore, plaintiff's claim of simple negligence based on the officers' intentional acts fails.  See Smith v. Lusk, No. 12-2063, 533 F. App'x 280, 284 (4th Cir. Jul. 18, 2013) (holding that estate of nightclub patron shot and killed by police officer could not prevail on a claim of simple negligence where evidence demonstrated that officer intentionally shot patron); see also

they are entitled to qualified immunity on the Section 1983 claim.

## Summary Judgment Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden of establishing that there is no genuine issue as to any material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  This burden can be met by showing that the nonmoving party has failed to prove an essential element of the nonmoving party's case for which the nonmoving party will bear the burden of proof at trial.  Id. at 322.  If the moving party meets this burden, according to the United States Supreme Court, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

---

Rhodes v. King, CIVIL ACTION NO. 2:19-cv-00626, 2020 WL 4607323, *4 (S.D.W. Va. Aug. 11, 2020) (dismissing negligence claim arising out of intentional shooting).

Once the moving party has met this burden, the burden shifts
to the nonmoving party to produce sufficient evidence for a jury
to return a verdict for that party.

> The mere existence of a scintilla of evidence in
> support of the plaintiff's position will be
> insufficient; there must be evidence on which the jury
> could reasonably find for the plaintiff.  The judge's
> inquiry, therefore, unavoidably asks whether reasonable
> jurors could find, by a preponderance of the evidence,
> that the plaintiff is entitled to a verdict . . . .

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  "If
the evidence is merely colorable, or is not significantly
probative, summary judgment may be granted."  Id. at 250-51.

## Analysis

The defense of "[q]ualified immunity shields a government
official from liability for civil monetary damages if the
officer's 'conduct does not violate clearly established statutory
or constitutional rights of which a reasonable person would have
known.'"  Wiley v. Doory, 14 F.3d 993, 995 (4th Cir. 1994);
(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  In
Saucier v. Katz, 533 U.S. 194, 195 (2001), the Supreme Court laid
out a two-step process for resolving the qualified immunity
claims of government officials.  First, a court must decide
whether the facts that a plaintiff has alleged or shown make out
a violation of a constitutional right.  See id. at 201.  Second,
a court must decide whether the right at issue was "clearly
established" at the time of defendant's alleged misconduct.  See

id. Courts may exercise discretion in deciding which of the two

Saucier prongs "should be addressed first in light of the

circumstances in the particular case at hand." Pearson v.

Callahan, 555 U.S. 223, 236 (2009).

> A clearly established right is one that is
> "sufficiently clear that every reasonable official
> would have understood that what he is doing violates
> that right." Reichle v. Howards, 566 U.S. ----, ----,
> 132 S. Ct. 2088, 2093, 182 L. Ed.2d 985 (2012)
> (internal quotation marks and alteration omitted). "We
> do not require a case directly on point, but existing
> precedent must have placed the statutory or
> constitutional question beyond debate." Ashcroft v.
> al-Kidd, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L.
> Ed.2d 1149 (2011). Put simply, qualified immunity
> protects "all but the plainly incompetent or those who
> knowingly violate the law." Malley v. Briggs, 475 U.S.
> 335, 341, 106 S. Ct. 1092, 89 L. Ed.2d 271 (1986).
>
> "We have repeatedly told courts . . . not to
> define clearly established law at a high level of
> generality." al-Kidd, supra, at 742, 131 S. Ct. 2074.
> The dispositive question is "whether the violative
> nature of particular conduct is clearly established."
> Ibid. (emphasis added). This inquiry "'must be
> undertaken in light of the specific context of the
> case, not as a broad general proposition.'" Brosseau
> v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L.
> Ed.2d 583 (2004) (per curiam ) (quoting Saucier v.
> Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed.2d
> 272 (2001)). Such specificity is especially important
> in the Fourth Amendment context, where the Court has
> recognized that "[i]t is sometimes difficult for an
> officer to determine how the relevant legal doctrine,
> here excessive force, will apply to the factual
> situation the officer confronts." 533 U.S., at 205,
> 121 S. Ct. 2151.

Mullenix v. Luna, 577 U.S. 7, 11-12 (2015).

Whether a right is clearly established is a question of law.

Ray v. Roane, 948 F.3d 222, 228 (4th Cir. 2020). In deciding it,

this court is to consider the Supreme Court, Fourth Circuit, and
Supreme Court of Appeals of West Virginia precedent first.  See
id. at 229; see also Wilson v. Prince George's Cnty., Maryland,
893 F.3d 213, 221 (4th Cir. 2018) ("To determine whether a right
is clearly established, we assess whether the law has been
authoritatively decided by the Supreme Court, the appropriate
United States Court of Appeals, or the highest court of the
state.") (internal quotation and citation omitted).

In 2018, the Supreme Court decided Kisela v. Hughes, 138 S.
Ct. 1148 (2018), a case which is instructive in resolving the
instant motion for summary judgment.  In that case, Andrew
Kisela, a police officer in Tucson, Arizona, shot Amy Hughes in
May 2010.  See id. at 1150.

> Kisela and two other officers had arrived on the scene
> after hearing a police radio report that a woman was
> engaging in erratic behavior with a knife.  They had
> been there but a few minutes, perhaps just a minute.
> When Kisela fired, Hughes was holding a large kitchen
> knife, had taken steps toward another woman standing
> nearby, and had refused to drop the knife after at
> least two commands to do so.

Id.  The Kisela court laid out the test for determining whether
an officer has used excessive force in violation of the Fourth
Amendment:

> In one of the first cases on this general
> subject, Tennessee v. Garner, 471 U.S. 1, 105 S .Ct.
> 1694, 85 L. Ed.2d 1 (1985), the Court addressed the
> constitutionality of the police using force that can be
> deadly.  There, the Court held that "[w]here the
> officer has probable cause to believe that the suspect
> poses a threat of serious physical harm, either to the

15

officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." Id., at 11, 105 S. Ct. 1694.

In Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed.2d 443 (1989), the Court held that the question whether an officer has used excessive force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Ibid. And "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id., at 396–397, 109 S. Ct. 1865.

Id. at 1152.  The Court concluded that it did not need to decide whether Kisela used deadly force against Hughes because, "even assuming a Fourth Amendment violation occurred", "Kisela was at least entitled to qualified immunity."  Id.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." White v. Pauly, 580 U.S. ----, ----, 137 S. Ct. 548, 551, 196 L. Ed.2d 463 (2017) (per curiam )(alterations and internal quotation marks omitted). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed.2d 583 (2004) (per curiam).

Although "this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the

16

statutory or constitutional question beyond debate." White, 580 U.S., at ----, 137 S. Ct., at 551 (internal quotation marks omitted).  "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law."  Ibid. (internal quotation marks omitted).  This Court has "'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'"  City and County of San Francisco v. Sheehan, 575 U.S. ----, ----, 135 S. Ct. 1765, 1775-1776, 191 L. Ed.2d 856 (2015) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L. Ed.2d 1149 (2011)); see also Brosseau, supra, at 198-199, 125 S. Ct. 596.

        "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."  Mullenix v. Luna, 577 U.S. ----, ----, 136 S. Ct. 305, 308, 193 L. Ed.2d 255 (2015) (per curiam) (internal quotation marks omitted).  Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue.  Id., at ----, 136 S. Ct., at 309 (internal quotation marks omitted and emphasis deleted).  Precedent involving similar facts can help move a case beyond the otherwise "hazy border between excessive and acceptable force" and thereby provide an officer notice that a specific use of force is unlawful.  Id., at ----, 136 S. Ct., at 312 (internal quotation marks omitted).

        "Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers."  White, 580 U.S., at ----, 137 S. Ct., at 552 (internal quotation marks omitted).  But the general rules set forth in "Garner and Graham do not by themselves create clearly established law outside an 'obvious case.'"  Ibid.  Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness.  An officer "cannot

be said to have violated a clearly established right
unless the right's contours were sufficiently definite
that any reasonable official in the defendant's shoes
would have understood that he was violating it."
Plumhoff v. Rickard, 572 U.S. ----, ----, 134 S. Ct.
2012, 2023, 188 L. Ed.2d 1056 (2014).  That is a
necessary part of the qualified-immunity standard, and
it is a part of the standard that the Court of Appeals
here failed to implement in a correct way.

     Kisela says he shot Hughes because, although
the officers themselves were in no apparent danger, he
believed she was a threat to Chadwick.  Kisela had mere
seconds to assess the potential danger to Chadwick.  He
was confronted with a woman who had just been seen
hacking a tree with a large kitchen knife and whose
behavior was erratic enough to cause a concerned
bystander to call 911 and then flag down Kisela and
Garcia.  Kisela was separated from Hughes and Chadwick
by a chain-link fence; Hughes had moved to within a few
feet of Chadwick; and she failed to acknowledge at
least two commands to drop the knife.  Those commands
were loud enough that Chadwick, who was standing next
to Hughes, heard them.  This is far from an obvious
case in which any competent officer would have known
that shooting Hughes to protect Chadwick would violate
the Fourth Amendment.

Id. at 1152-53.

As in Kisela, the court exercises its discretion to proceed

directly to the second prong of the qualified immunity analysis

and considers whether the law was such that Troopers Hephner and

Long would have known that shooting Copson under the

circumstances presented violated the Fourth Amendment.  In so

doing, the court is cognizant of "the importance of drawing

inferences in favor of the nonmovant" while "tak[ing] care not to

define a case's 'context' in a manner that imports genuinely

disputed factual propositions."  Tolan v. Cotton, 134 S. Ct.

18

1861, 1866 (2014) (quoting <u>Brousseau v. Haugen</u>, 543 U.S. 194, 195, 198 (2004)).

Therefore, defined at the level of specificity required by the Supreme Court and drawing inferences in favor of plaintiff, the court must determine whether it was clearly established law in February 2017, that shooting Copson was an unconstitutional use of excessive force when:  (1) the officers were responding to a 911 call and were able to observe that Copson was holding a large knife and behaving erratically in a public place; (2) at the time he was shot, Copson was standing about 15 feet from the officers holding a knife and making sudden movements; and (3) Copson ignored the officers' repeated commands to drop the knife. <u>See, e.g.</u>, <u>Wilson v. Prince George's Cnty., Maryland</u>, 893 F.3d 213, 222 (4th Cir. 2018).  The court's "review of relevant precedent" shows "that it was not clearly established law in [February 2017] in the Supreme Court, th[e Fourth] Circuit, or in the [West Virginia Supreme Court of Appeals] that an officer shooting an individual under such circumstances would be engaging in an unconstitutional use of force."  <u>Id.</u>

The cases plaintiff relies on would not have placed Troopers Hephner and Long on such notice.[5]  While plaintiff relies on the

---

[5] For example <u>Betton v. Belue</u>, 942 F.3d 184 (4th Cir. 2019), and <u>Wilson v. Prince George County</u>, 893 F.3d 213 (4th Cir. 2018), were both decided after the shooting at issue here.  The Supreme Court has made clear "because a reasonable officer is not required to foresee judicial decisions that do not yet exist in

line of cases holding that "mere possession" of a weapon does not justify the use of deadly force, see Cooper v. Sheehan, 735 F.3d 153, 154, 159 (4th Cir. 2013), this is not that type of case. Here, Copson was not shot solely because he had a deadly weapon in his possession.  Rather, he was waving that weapon in a public setting while behaving erratically and refusing officers' repeated commands to drop the knife.  Therefore, the Cooper decision did not put Troopers Hephner and Long "on notice that shooting [Copson] would be crossing a bright line in violation of the Fourth Amendment."  Wilson, 893 F.3d at 222; see also Anderson v. Russell, 247 F.3d 125, 128 (4th Cir. 2001) (holding that officers were entitled to qualified immunity for shooting a man suspected of carrying a gun who initially complied with commands, but later lowered his hands and reached into his back left pocket toward a bulge under his clothing); Slattery v. Rizzo, 939 F.2d 213, 215-16 (4th Cir. 1991) (holding that shooting of an individual, suspected of narcotics trafficking, was objectively reasonable when the suspect ignored commands to raise his hands and turned in the officers' direction with his hand partially closed around an object).

---

instances where the requirements of the Fourth Amendment are far from obvious" that cases decided after the events in question are "of no use in the clearly established inquiry."  Kisela, 138 S. Ct. at 1154.

Connor v. Thompson, 647 F. App'x 231 (4th Cir. 2016), is
likewise unhelpful.  In Connor, the officer responded to a 911
call that Adam Carter was suicidal.  See id. at 233-34.  When the
officer arrived at the house, he was escorted by a roommate into
an entrance foyer with a four-step stairwell leading to the
living room where Carter was waiting.  See id. at 234.  As Carter
"was about halfway down the four stairs" the officer saw that the
decedent was holding a paring knife.  Id.  The officer "drew his
gun and told Carter to drop the knife.  The command was repeated
several times . . . but Carter did not comply.  When Carter
reached the bottom of the stairs, [the officer] fired twice,
killing him."  Id.

The Court of Appeals affirmed the district court's denial of
qualified immunity, explaining,

> Viewing the record in the light most favorable to the
> Appellee, Carter possessed a paring knife, refused to
> comply with repeated commands to drop the weapon,
> continued down the stairs (and thus closer to [the
> officer]) rather than stopping.  As for the knife, we
> have held the mere possession of a deadly weapon by a
> suspect is not enough to permit the use of deadly
> force.  Instead, deadly force may only be used by a
> police officer when, based on a reasonable assessment,
> the officer or another person is threatened with the
> weapon.  And while Carter stubbornly maintained
> possession of his knife, the assumed circumstances [the
> officer] confronted do not establish that Carter
> threatened anyone with it.
>
> For the present inquiry, the district court
> appropriately assumed Carter never raised his knife,
> changed hands, or acted aggressively with it.  We have
> held that holding a weapon in a non-threatening
> position while making no sudden moves fails to support

21

the proposition that a reasonable officer would have
had probable cause to feel threatened.  [The officer],
moreover, had been informed that Carter was suicidal,
which could have explained the reason for holding the
knife.

Id. at 237-38 (internal citations and quotations omitted).

In this case, however, Copson was holding a large knife in a
public area and waving it at the officers.  He refused to drop
the knife despite repeated entreaties to do so.  And, unlike in
Connor, there is no indication that Copson was suicidal and the
officers were not aware he suffered from mental illness.

Nor is Clem v. Corbeau, 284 F.3d 543 (4th Cir. 2014),
sufficiently analogous to the present case to put Troopers
Hephner and Long on notice that their conduct would violate the
law.  In Clem, two officers responded to a call from a woman
claiming that her husband (Clem) was suffering from dementia,
depression, and various physical problems.  See id. at 545.  At
the time he was shot, Clem was "known to the officers to be
mentally ill . . . obviously unarmed, . . . stumbling toward the
bathroom in his own house with pepper spray in his eyes, unable
to threaten anyone."  Id. at 552.  Without giving Clem any
warning, one of the officers shot him.  See id. at 547.  The
Fourth Circuit held that the officer's use of force was
unreasonable in violation of the Fourth Amendment.  See id. at
552.

22

In this case, the officers did not know that Copson was mentally ill; Copson was armed with a knife and waving it around; Copson refused to put down the knife on multiple occasions; and Copson was not incapacitated by pepper spray when he was shot.

Finally, Streater v. Wilson, 565 F. App'x 208 (4th Cir. 2014), is too factually dissimilar to this case to have put the officers on notice.  In Streater, officers responded to the scene of a stabbing where they were informed the assailant had already fled and weighed approximately 240 pounds.  See id. at 209.  The victim's minor son, weighing between 115 and 120 pounds, was "walking quickly toward the scene" and "carrying a kitchen knife that he picked up at home after learning that his mother had been stabbed."  Id.  Observing the knife, the officer unholstered his gun and told the son to drop his knife three times.  See id.  The son "failed to comply and continued to approach."  Id.  The son stopped 31.9 feet from the officer and dropped his knife. Nevertheless, the officer fired a total of four shots, hitting the son twice.  See id.

The United States Court of Appeals for the Fourth Circuit upheld the district court's determination that the officer's actions were not shielded by qualified immunity because the officer had violated the son's clearly established Fourth Amendment rights.  See id. at 212.  As the court put it, by the time the officer "decided to take what he called a 'kill shot,'

23

[the son] had disarmed, was neither approaching nor threatening the officers or civilians, and based on the police broadcast and Streater's protests, was not a suspect in the domestic assault." Id.  Unlike in Streater, at the time he was shot, Copson was closer to defendants, still armed, not complying with commands to drop his weapon, and advancing toward Hephner.

### Conclusion

In this case, the court "need not, and does not, decide whether [Troopers Hephner and Long] violated the Fourth Amendment when [they] used deadly force against [Copson]." Kisela, 138 S. Ct. at 1152.  The court proceeds in this way because, even assuming a Fourth Amendment violation occurred, the officers were entitled to qualified immunity.  "[Q]ualified immunity protects actions in the 'hazy border between excessive and acceptable force.'" Mullenix v. Luna, 577 U.S. 7, 18 (2015) (quoting Brosseau v. Haugen, 543 U.S. 194, 201 (2004)).  "Hard cases can make bad law, and it is to protect against that possibility that police officers possess the defense of qualified immunity." Pinder v. Johnson, 54 F.3d 1169, 1179 (4th Cir. 1995).

Based on the foregoing, defendants' motion for summary judgment is **GRANTED**.

The Clerk is directed to send copies of this Memorandum Opinion and Order to all counsel of record.

It is SO ORDERED this 30th day of March, 2021.

ENTER:

David A. Faber
Senior United States District Judge